CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

JEFF MITCHELL (CABN 236225)
Chief, Criminal Division

BENJAMIN K. KLEINMAN (NYBN 5358189)
DANIEL M. PASTOR (CABN 297948)
MOLLY K. PRIEDEMAN (CABN 302096)
Assistant United States Attorneys

    1301 Clay Street, Suite 340S
    Oakland, California 94612
    Telephone: (510) 637-3680
    FAX: (510) 637-3724
    benjamin.kleinman2@usdoj.gov
    daniel.pastor@usdoj.gov
    molly.priedeman@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 4:25-CR-00275-JST-04 |
| Plaintiff, | JOINT SENTENCING MEMORANDUM |
| v. | Requested Date:  May 1, 2026 |
| VASU SHARMA, | Requested Time:  9:30 a.m. |
| Defendant. | Court:        Honorable Jon S. Tigar |

## I.   INTRODUCTION

The defendant, VASU SHARMA, will appear before the Court on May 1, 2026, and plead guilty to Count One of the captioned Indictment – Conspiracy to Commit Wire Fraud in violation of 18 U.S.C. § 1349.  The parties jointly request that, following the defendant's guilty plea, the Court impose a time-served sentence for the reasons explained below.

The parties agree that the defendant's adjusted offense level is 9, and therefore his guideline sentencing range is 4 to 10 months' imprisonment.  The defendant was arrested in Singapore while

JOINT SENTENCING MEMO
4:25-CR-00275-JST-04

1

attending a cryptocurrency conference on October 1, 2025.  The defendant has been in custody, first in Singapore and then in the United States, since his arrest.  On May 1, 2026, the defendant will have served seven months in custody.  The parties respectfully submit that the jointly recommended sentence of time-served is sufficient but not greater than necessary based upon the advisory guideline range, as well as the sentencing factors set out in 18 U.S.C. § 3553(a).  The defendant is an Indian national, and should the Court impose a time-served sentence, the defendant will immediately self-deport and return to India.  It is unlikely that the defendant will ever be permitted to return to the United States.

The Court may sentence without a presentence investigation report if it "finds that the information in the record enables it to meaningfully exercise its sentencing authority under 18 U.S.C. § 3553" and "explains its finding on the record."  Fed. R. Crim. Proc. 32(c)(1)(A)(ii); *see also* Fed. R. Crim. P. 32(b)(1), U.S.S.G. §6A1.1, Crim. Local Rule 32-1(b).  The parties respectfully submit that the record here—the Indictment, the plea agreement, and the parties' joint sentencing memorandum, all detailing the defendant's offense conduct and other factors relevant under § 3553—enable the Court to meaningfully exercise its sentencing authority and proceed to sentencing without the need for a presentence investigation report.  The parties further request that the Court explain this finding and the sufficiency of the record at time of sentence.

## II.    THE CONDUCT

The defendant worked as a business development associate for Contrarian Technologies Ltd. ("CONTRARIAN"), a company based in India and registered in the British Virgin Islands that did business in the United States and elsewhere.  CONTRARIAN purported to offer "market making" services for cryptocurrency projects.  In reality, CONTRARIAN employees perpetrated a sophisticated market manipulation scheme in which customers paid CONTRARIAN approximately $3,000 per month to artificially inflate the trading volume and price of those customers' cryptocurrency tokens through wash trading.  "A wash trade is a prearranged pair of trades of the same good between the same parties, involving no economic risk and no net change in beneficial ownership."  *Arandell Corp. v. Centerpoint Energy Servs., Inc.*, 900 F.3d 623, 627 n.2 (9th Cir. 2018) (internal quotations omitted).

Wash trading created the appearance that CONTRARIAN's clients' cryptocurrency tokens had active, organic trading markets (i.e. there was real demand for them) at increasing prices, which induced

unwitting investors to purchase those tokens.  CONTRARIAN and its clients then profited by selling off the tokens at the artificially inflated price created by CONTARIAN's wash trading.  In short, CONTRARIAN executed so-called pump-and-dump schemes with cryptocurrency tokens.  First CONTRARIAN spread misleading market information through wash trading to create a buying frenzy and then sold its holdings of the token at the peak price.  When CONTRARIAN stopped wash trading, demand for the token vanished and the price plummeted, which left the unwitting investors who had purchased tokens from CONTRARIAN with tokens that were worth significantly less than what they had paid for them.

As described in the Indictment, the Chief Executive Officer and founder of CONTRARIAN, Manu Singh, maintained a flow chart, which explicitly outlined the wash trading and market manipulation scheme.  The chart listed one of the steps as a "Price Pump," wherein CONTRARIAN "start[s] selling" the cryptocurrency to "create an illusion of hot/bull market" by using "fake accounts/bots to make numbers look decentralized and active." Dkt. 1. at pg. 9, lns. 8-12.  As highlighted in the chart, the goal of the pump was to "Attract more investors, especially normies, people that don't understand the market, to ensure smooth dump." *Id.*

The Indictment in this case was the result of an undercover operation by the Federal Bureau of Investigation (FBI) targeting illicit "wash trading" in the cryptocurrency industry.  As part of the undercover operation, federal law enforcement created several cryptocurrency tokens, including the Powerlink token, which were launched and traded on a cryptocurrency exchange (Uniswap).

As a business development associate, the defendant pitched CONTRARIAN's services to potential clients knowing full well that the goal of CONTRARIAN, in partnership with its clients, was to manipulate clients' cryptocurrency tokens and trick unwitting investors to purchase the tokens at artificially inflated prices.  For example, during a call with the defendant, the FBI Undercover Employee ("UCE") asked if the defendant could "pump the volumes" and "market cap" for the Powerlink token, and the defendant responded, "Definitely. Definitely. That's what we do."  The defendant further explained, "We begin with volume generation and then increasing the market cap in terms of circulating [the Powerlink token] and fully diluted valuations as per your required benchmarks."

Ultimately, the Powerlink token was minted and traded on October 8 and October 9, 2024, on a

cryptocurrency exchange.  On October 10, 2024, the UCE asked the defendant how much of the trading volume of the Powerlink token was generated by CONTRARIAN.  The defendant responded that CONTRARIAN generated "nearly all" of the trading volume.  The FBI's trading analysis corroborated the defendant's statement and revealed that substantially all the activity generated following the launch of Powerlink was the result of CONTRARIAN's wash trading.

In total, there were 942 buy/sell transactions of the Powerlink token.  Of this total, 922 (or 97.9%) of the buy and sell transactions were conducted by CONTRARIAN controlled cryptocurrency wallets.  There were just 18 organic trades from retail investors, which stemmed from 5 different cryptocurrency wallets and resulted in a loss to those investors of approximately $1,459.

## III.     SENTENCING RECOMMENDATION

### A.  Legal Standard

The United States Sentencing Guidelines serve as "the starting point and the initial benchmark" of any sentencing process and are to be kept in mind throughout the process.  *See United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008); *see also United States v. Kimbrough*, 522 U.S. 85, 108 (2007).  The overarching goal of sentencing, as set forth by Congress, is for the Court to "impose a sentence sufficient, but not greater than necessary."  *Carty*, 520 F.3d at 991 (citation omitted).  In accomplishing that goal, the Court should consider the factors set forth under 18 U.S.C. § 3553(a), which include:

(1)    the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)    the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(3)    the need for the sentence imposed to afford adequate deterrence to criminal conduct; and

(4)    the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

//

//

//

//

JOINT SENTENCING MEMO                                   4
4:25-CR-00275-JST-04

**B.  The Parties' Recommended Sentence is Sufficient but not Greater than Necessary to Achieve the Purposes of Sentencing**

There are a number of factors that support the parties' recommendation.  *First*, the defendant has no criminal record.  *Second*, the defendant accepted responsibility at the first available opportunity.  *Third,* while the defendant is certainly culpable, he played a relatively minor role at CONTARIAN, was employed at the company for less than a year, and did not significantly financially benefit from the scheme.  According to the defendant, this was the only token that he "enlisted" for CONTRARIAN as a business development associate.  Otherwise, he generally handled back-office tasks and did promotion for tokens that were recruited by other employees at CONTRARIAN.  Given the defendant's minor role, the parties agree that, in terms of the loss amount, the defendant should only be liable for the intended loss of the Powerlink token.

*Fourth*, the parties submit that the deterrence goals of sentencing are accomplished by a time-served sentence.  Regarding general deterrence, the sentence demonstrates that those who perpetrate cryptocurrency pump-and-dump schemes will be arrested and serve time in prison.  As noted above, the defendant was arrested while attending a cryptocurrency conference in Singapore and spent six months in a Singaporean prison before he was extradited to the United States on March 26, 2026.  In total, the defendant served seven months in jail, and the sentence sends a clear message that those who perpetrate cryptocurrency pump-and-dump schemes will be prosecuted, even if the perpetrator is overseas and it is his first offense.

With respect to specific deterrence for the defendant, he knows that the government will seek to arrest, prosecute, and imprison him should he continue to perpetrate cryptocurrency wash trading schemes.  Additionally, the defendant is not a United States citizen.  Now, it is virtually certain that travel to the United States will be unavailable to him.

In conclusion, the parties believe that the recommended sentence, which is within the defendant's guideline range, sends a clear message to the defendant and others that this criminal behavior will not be tolerated.  Nor is the defendant, given his surprise at being arrested in Singapore and the time in custody he has served as a result of his actions, likely to repeat the criminal conduct for which he was prosecuted.

## IV.   CONCLUSION

For these reasons, the parties jointly recommend that the Court sentence the defendant to time served (approximately seven months in custody) and a $100 special assessment. The parties believe that supervised release is not needed in this case because the defendant will immediately self-deport and return to India and is not expected to be readmitted to the United States.

DATED: April 23, 2026

Respectfully submitted,

CRAIG H. MISSAKIAN
United States Attorney

*/s/ Benjamin K. Kleinman*
BENJAMIN K. KLEINMAN
DANIEL M. PASTOR
MOLLY K. PRIEDEMAN
Assistant United States Attorneys

*/s/ Eric S. Rosen*
ERIC S. ROSEN (*pro hac vice*)
YUSEF AL-JARANI
DYNAMIS LLP
Counsel for Defendant VASU SHARMA